IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br>Alan Kush,<br>                 Debtor, | Chapter 7<br>Case No. 05- 24972<br>Adv. No. 06-225 |
| Barbara Kush,<br>      Plaintiff,<br>  vs.<br>Alan Kush,<br>      Defendant | MEMORANDUM DECISION |

## 1. Preliminary Statement

The Plaintiff, Barbara Kush, filed her Complaint seeking to have certain debt excepted from discharge pursuant to 11 U.S.C. § 523(a)(15) on February 10, 2006. The Defendant, Alan Kush, filed his Answer on April 11, 2006. The Court conducted various pre-trial proceedings in this Adversary Proceeding, and a trial was conducted on September 13, 2006.

The Plaintiff is seeking to have a debt in the principal amount of $36,349, plus interest accruing thereon, deemed non-dischargeable. This Decision shall constitute the Court's

1

Case 2:06-ap-00225-SSC   Doc 15   Filed 10/30/06   Entered 10/31/06 14:52:19   Desc
Main Document      Page 1 of 13

findings of fact and conclusions of law pursuant to Fed.R.Bank.P. 7052.  The Court has jurisdiction over this matter, and this is a core proceeding.  28 U.S.C. §§ 1334 and 157 (West 2006).

## II.  Discussion

### 1.  Factual Findings

The Plaintiff and the Debtor were married in 1975.  During the marriage, the Debtor owned a landscaping business that failed to remit payroll withholding and other taxes during the 1996 and 1997 taxable years.  At that time, the Plaintiff was employed by Arizona State University.  The couple filed for divorce in 1997, and on March 17, 1999, a Consent Judgment and Decree for Dissolution of the Marriage ("Decree") was entered.  The Decree awarded the house at 1639 W. Inverness, Tempe, Arizona, 85282 to the Plaintiff.  It awarded all items related to the landscaping business to the Debtor.  The Decree provided, inter alia, that each party would be responsible for, pay, and hold the other harmless from all income taxes, and any interest and penalties thereon, attributed to all assets and liabilities awarded or confirmed to that party by the Decree.  The Decree also affirmed that the Debtor would indemnify the Plaintiff and hold her harmless for any debt, liability or obligation which he had therein been ordered to pay.

The Plaintiff testified, and the Debtor did not refute, that on May 17, 1999, the Plaintiff received two Notices of Intent to Levy from the Internal Revenue Service, addressed to both her and the Debtor.  These Notices related to the withholding taxes from the Debtor's landscaping business for the 1996 and 1997 taxable years which remained unpaid.  Since the Decree required that the Debtor pay said taxes, the Plaintiff requested said payment by him.  The Debtor could not, or did not, pay the taxes, and since the Plaintiff was in danger of losing her home as a result of the Notices, the Debtor agreed to assist the Plaintiff by co-signing an obligation creating a second mortgage on her home from The Money Store.  The funds derived

2

from the second mortgage were utilized by the Plaintiff to pay the Debtor's tax obligations. In turn, the Debtor agreed to make all payments on the second mortgage as a form of reimbursement or indemnification to the Plaintiff.

At the time of the close of escrow, the Plaintiff and the Debtor agreed to repay The Money Store the principal amount of $25,255.41, with interest to accrue thereon at the annual rate of 12.72%.[1] Pursuant to the agreement between the Plaintiff and the Debtor, the loan closing statement provided for the payment of the Debtor's obligations of $22,294.07 to the Internal Revenue Service and $1,011.51 to the Arizona Department of Revenue.[2] The Debtor and

---

[1] The Settlement Statement and other loan documents presented by the Plaintiff as Exhibit 11 are unsigned. However, these documents were admitted into evidence, with the Debtor not disputing their accuracy, veracity, or authenticity. The Money Store Loan Settlement Statement, dated July 22, 1999, reflects the principal amount of the loan to be $25,255.41, whereas the Truth in Lending Disclosure reflects a slightly different principal amount of $25,650.04. It appears that the amount set forth in the Settlement Statement is the final amount agreed to between the parties, reflecting a further reduction of the principal amount by the Debtor as of the closing date. For purposes of this Decision, the Court will use the lower principal amount of $25,255.41.

[2] Exhibit 11. The Plaintiff also obtained Credit Life, which cost an additional $1,319.83. Because the Debtor agreed to pay the debt resulting from the Plaintiff's payment of his Federal and State taxes, the Court has included the full amount of the second mortgage obligation as the principal amount of the non-dischargeable debt. It should be noted that the Debtor made payments on said debt for a number of years and ultimately executed a second promissory note agreeing to repay the then remaining obligation of $24,143.69. See Exhibit 4.

3

the Plaintiff co-signed the promissory note, and were named on all documents associated with the loan. As a result, they committed to repay the obligation in 180 monthly payments of $319.75 each, for total principal, interest, and other payments on the loan in an amount equal to $57,555.95. However, because of the Debtor's agreement to indemnify the Plaintiff, the Debtor agreed to make all payments on the loan and keep the mortgage coupon book. Later, the Debtor changed the billing address for the loan, on file with The Money Store, to his address from that of the Plaintiff. The Debtor made all payments on the second mortgage for a period of nearly four years.

The Plaintiff later became romantically involved with a certain Mr. Goff, who agreed to pay off the first mortgage on the Plaintiff's home. As a result, the second mortgage of The Money Store became a first lien on the property. The Plaintiff testified that once she terminated her relationship with Mr. Goff, she desired to repay him for the moneys advanced by him to pay off her first mortgage. The Plaintiff decided to obtain refinancing, but soon found that no lender would advance any funds to her unless said lender obtained a first lien on her home. Such a condition for refinancing required that she pay The Money Store in full. Once again she approached the Debtor. Since HomEq was willing to provide such financing, the Debtor and Plaintiff agreed that HomEq would pay off the obligation to The Money Store, the Debtor would execute a new promissory note in favor of the Plaintiff in the principal amount then remaining due and owing to The Money Store, and the Debtor would make payments to the Plaintiff on said note, with the Plaintiff to make payments on the underlying loan to HomEq. At the time, the principal amount of $24,143.69 remained due and owing on The Money Store loan. The Plaintiff testified that the Debtor and Plaintiff attempted to replicate the terms of The Money Store loan. They memorialized their agreement in a notarized "Promissary Note" [sic] ("Note"), dated March 24, 2003, in which the Debtor agreed to pay 136 payments of $319 each to the Plaintiff, for a total amount of principal, interest, and other charges of $43,384.[3] The Note

---

[3] Plaintiff's Exhibit 4 no. 471. The principal amount was $24,143.69.

4

provided that any late payment would result in a fee of $25. The Debtor provided no evidence to refute any of the foregoing factual findings.

The Plaintiff's detailed accounting reflects that the Debtor made payments on the Note until April, 2005; at that point, the Debtor ceased making payments. The Plaintiff sent several letters to the Debtor regarding the default, after she was unable to contact him by telephone. The Plaintiff's accounting reflects that prior to the cessation of the Debtor's payments, he did make some payments late, incurring late fees. As of January 2006, the Debtor owed the Plaintiff the principal amount of $24,473.67 on which interest of $7,690.27 had accrued, totaling $32,163.94 due and owing at that time.[4]

---

[4] The parties executed the Promissory Note, which set forth 136 payments of $319 per month using the standard amortization statement generated initially by the Money Store. This Note would have required the payment of the principal amount of $24,143.69. Plaintiff's Exhibit 4 no. 471, 473. The Plaintiff multiplied 136 by $319 to arrive at a total loan payoff, including interest, of $43,384.00. Plaintiff's Exhibit 5 no. 465. Although the Plaintiff testified that the parties had the Note created with the payments set up the same way they were as if the Debtor were still paying on the second mortgage, the parties' method of arriving at the total loan payoff is not relevant to this Court's determination of what the non-dischargeable principal amount of the obligation is at this time. See Plaintiff's Exhibits 4-7. This is because, under the parties' method of accounting, the Plaintiff's payoff amount is inflated by the interest accrual component. To determine the principal amount the Plaintiff is currently owed, the Court has created a new schedule using the parties' agreed terms, including the original principal amount, the interest rate, any payments made by the Defendant, and any late fees. See Exhibit A, "Loan Amortization Schedule." The Schedule indicates that the principal amount currently due and

5

Case 2:06-ap-00225-SSC    Doc 15    Filed 10/30/06    Entered 10/31/06 14:52:19    Desc
Main Document    Page 5 of 13

The Debtor, acting pro se, presented his own documentation to the Court, apparently only in support of his poor financial position, but he failed to request admission of any of these documents into evidence. The Debtor also advised the Court that as of the time of the trial, he had failed to file his 2005 income tax returns, so he was unable to provide critical information to the Court as to his current financial situation. Additionally, he provided no budget of his current personal income or expenses; the only documentation reflecting his income and expenses being the schedules that he filed at the commencement of his administrative case. The Debtor did testify that he worked at Big Lots in addition to running his landscaping business. However, without more information, the Court was unable to make a determination of the Debtor's inability to pay or relative detrimental consequences/benefit of the parties concerning the Debtor's discharge.

Even if the Court were to consider and analyze the Debtor's exhibits, which were not admitted into evidence, the Court has additional concerns. For example, the Debtor testified regarding his 2004 tax returns which reflected that the Debtor had received a substantial amount of income that year: net earnings from his business in excess of $50,000. However, the Debtor

---

owing is $24,473.67, on which interest continues to accrue at the annual rate of 12.72% per annum. See Fullmer v. U.S., 962 F.2d 1463, 1468 (10th Cir. 1992) (holding that non-dischargeable debt persists unmodified during and after bankruptcy as a personal liability and therefore accrues interest, unlike a dischargeable liability of the estate); 4 COLLIER ON BANKR. ¶ 502.0.(3)(b)(3) (summarizing prevailing view, regarding non-dischargeable debt, that bankruptcy simply suspends the payment of interest accruing on the debt until a judgment is entered declaring the debt non-dischargeable, but does not modify the debt to relieve payment of accruing interest). The parties may wish to create a new amortization schedule to facilitate repayment of the Debtor's obligation to the Plaintiff.

6

testified that in 2005, he earned only a net of $11,245 from his business because he lost a number of accounts. Given his net earnings in 2004, the Court did not find his substantial loss of income the following year, without further evidence, credible. The Debtor also testified that he suffered a loss of $30,720 in gross revenues between 2005 and 2006, but there was no support for that assertion other than the Debtor's self-serving testimony. Finally, the Debtor testified that in 2005, his income was supplemented by the sum of $16,748.04 when he "cashed in" his IRA and an insurance policy. From this evidence, if considered, the Court is unable to conclude that the Debtor has an inability to pay the Plaintiff or, after weighing the detrimental consequences to be suffered by the Plaintiff versus the benefit to be obtained by the Debtor, that the Debtor should receive a discharge of the Plaintiff's debt.

## 2. Legal Discussion

For the Plaintiff to succeed on her claim under Section 523(a)(15), she bears the burden of a <u>prima facie</u> showing that the particular obligation to be excepted from discharge is not in the nature of support and arises from a divorce decree or other order of a court of record, incurred in the course of a divorce or separation.[5] <u>Jodoin v. Samayoa</u>, 209 B.R. 132, 141 (9th

---

[5] 11 U.S.C. § 523(a)(15)(West 2005) provides:

A discharge . . . does not discharge an individual debtor from any debt –

(15) not of the kind described in paragraph (5) that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record, a determination made in accordance with State or territorial law by a governmental unit unless –

(A) the debtor does not have the ability to pay such debt from income or property of the debtor not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor and, if the debtor is engaged in a business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business; or

(B) discharging such debt would result in a benefit to the debtor that outweighs the

7

Cir. B.A.P. 1997). The burden then shifts to the Debtor, who must prove that he does not have the ability to pay the obligation to the Plaintiff, or that the benefit he will receive from the discharge of the debt outweighs the detrimental consequences to the former spouse and any dependent of the parties. This is a balancing of the relative hardship to the Plaintiff versus the benefit to the Debtor if the debt is discharged. In re Myrvang, 232 F.3d 1116 (9th Cir. 2000); Jodoin, 209 B.R. at 141. Once the Plaintiff has met her burden of going forward to reflect that the debt is set forth in a divorce decree or order and is not in the nature of support, the Debtor carries the burden of persuasion on the issue of relative hardship. In re Fellner, 256 B.R. 898 (8th Cir. B.A.P. 2001); In re Konick, 236 B.R. 524 (1st Cir. B.A.P. 1999). The Debtor also carries the burden of persuasion on the issue of inability to pay, which must be assessed as of the time of trial. Jodoin, 209 B.R. at 142. Finally, "exceptions to discharge for domestic relations debts are liberally construed in favor of the objecting creditor." In re Swartz, 339 B.R. 497, 501 (Bankr. W.D. Mo. 2006).

Based upon the evidence presented, the Court concludes that the Plaintiff has met her burden of going forward, and the Debtor has not met his burden of persuasion on the issue of the ability to pay or the relative hardship to the parties. The Decree plainly sets forth an indemnification provision, allocates the business obligations and its expenses to the Debtor personally, and allocates the tax liability for the business to the Debtor. Arizona law provides that when one party to a divorce decree pays a debt therein that was allocated to the other, the "paying" spouse is entitled to reimbursement from the non-payer. See Srock v. Srock, 11 Ariz. App. 483, 484-85; 466 P.2d 34, 35-36 (Ariz. App. 1970). Such a debt is not enforceable as support, but is enforceable as a debt. Id.

Although the Plaintiff's original obligation related to an indemnification for the payment of the Debtor's tax obligations, it was subsequently transformed into an obligation under a promissory note. However, the Plaintiff was clearly able to trace the obligation. If a

---

detrimental consequences to a spouse, former spouse, or child of the debtor.

8

1 debt is originally non-dischargeable in bankruptcy, a change in the form or structure of the debt
2 does not change the nature of its non-dischargeability.. See <u>Merrill Lynch Business Financial</u>
3 <u>Services, Inc. v. Kim</u>, 125 B.R. 594 (Bankr. C.D. Cal. 1991) (holding that where the debtor
4 fraudulently obtained a credit line, the lender's restructuring of the loan to change the payment
5 terms and to add the debtor's home as security for the repayment of the obligation did not
6 change fundamentally the non-dischargeable nature of the loan, because the restructuring was an
7 extension, modification, or forbearance of the prior loan, rather than a new loan). In this case,
8 when the Plaintiff paid the Debtor's tax liability by obtaining a second mortgage on her home,
9 the Debtor entered into a loan transaction to repay or indemnify the Plaintiff. The fact that the
10 Plaintiff and the Debtor restructured or modified this obligation to allow the Plaintiff to pay a
11 third party did not change the essential nature of the obligation. The Debtor continued to agree
12 to repay the obligation because it had arisen out of the Decree and he had agreed that it would
13 remain his obligation. The essential nature of the obligation, a debt enforceable under Arizona
14 law which arose in connection with a divorce decree, was transferred to the Note. Thus, if the
15 Court determines the original obligation to be non-dischargeable under Section 523 (a)(15), that
16 finding may be transferred to, and be just as effective as to, the restructured obligation. Thus, if
17 this Court concludes that the original obligation obtained by the Plaintiff from The Money Store
18 is a non-dischargeable obligation that the Debtor must repay to the Plaintiff, the Debtor's
19 obligation, as set forth in the Note, is equally non-dischargeable.

20 The Court further emphasizes that the Plaintiff obtained the Debtor's consent
21 each time she changed the terms and conditions of the debt. Her undisputed testimony and the
22 evidence show that when she obtained the second mortgage on her home, she did so with the
23 Debtor's consent. The fact that the Debtor made almost four years of payments on the second
24 mortgage is further proof of his consent to its terms and conditions. When the Plaintiff
25 refinanced the second mortgage, she obtained the Debtor's consent once again, evidenced by his
26 signature on the Note. Accordingly, the Plaintiff has met her burden of going forward, or a

9

prima facie case, under Section 523(a)(15).

However, the Debtor has failed to carry his burden of persuasion. In light of the Debtor's unreliable, unsubstantiated testimony; his 2004 tax returns which reflect substantial earnings for the Debtor; his obtaining a second job in 2005; his failure to file his 2005 tax returns; and his failure to provide or substantiate his income and expenses, in a budgetary format, for 2005, the Debtor has failed to show this Court that he is unable to pay the sum of $320 per month to the Plaintiff. The Debtor's failure to provide his 2005 tax returns deprived the Court of reviewing the most relevant financial evidence concerning the Debtor's ability, as of the time of trial, to pay the obligation due and owing to the Plaintiff. See In re Jodoin, 209 B.R. at 142. Moreover, without accurate financial information from the Debtor, the Court is unable to commence the analysis of the relative hardship to the parties.

### III. Conclusion

Based upon the foregoing, the Court concludes that Debtor has failed to set forth any evidence which must be refuted by the Plaintiff. The Plaintiff met her burden of going forward, or a prima facie case, that the particular obligation to be excepted from discharge was not in the nature of support and arose from the Decree. The Debtor failed to present any credible evidence in support of his burden of persuasion. In essence, the Debtor presented no evidence which needed to be refuted by the Plaintiff. Therefore, the Court finds that the entire debt owing to the Plaintiff is non-dischargeable. The Debtor owed the Plaintiff the aggregate amount of $32,163.94 as of January 2006, with interest and costs continuing to accrue thereon. Under the Court's analysis, the Plaintiff is also entitled to reasonable attorney's fees as provided for in the parties' Note. Renfrow v. Draper. 232 F.3d 688 (9th Cir. 2000). The Plaintiff shall submit an affidavit regarding attorney's fees, to which the Defendant shall have the opportunity to object as to reasonableness and amount. The Court will execute a separate order incorporating this Memorandum Decision.

DATED this 30th day of October, 2006.

_____

Honorable Sarah Sharer Curley
United States Bankruptcy Judge

BNC TO NOTICE

11

# Exhibit A:
# Loan Amortization Schedule

| | | | | |
|---|---|---|---|---|
| Loan amount | $ 24,143.69 | | Scheduled payment | $ 319.00 |
| Annual interest rate | 12.72 % | | Scheduled number of payments | 136 |
| Loan period in months | 136 | | Actual number of payments | 23 |
| No. of payments per year | 12 | | Total early payments | 0 - |
| Start date of loan | 06/03/2003 | | | |
| Extra payment per month | $ 1.00 | | | |

Note: This amortization schedule was created using the information in Plaintiff's Exhibits 4-7. The Loan Amount is the principal amount set forth in the parties' Promissory Note, Plaintiff's Exhibit 4 no. 471. Also in the Note are the Start Date of loan, Scheduled Payment, and Scheduled Number of Payments. The Annual Interest Rate was obtained from the parties' HomEq mortgage Truth in Lending Disclosure Statement. Plaintiff's Exhibit 11 no. 291. The Number of Payments per Year, Extra Payment per Month, Actual Number of Payments, and Total Early Payments are those set forth in the Plaintiff's accounting of the Debtor's payments to her as set forth in Plaintiff's Exhibits 5-7.

| Pmt No. | Payment Date † | Beginning Balance | Scheduled Payment | Extra Payment | Total Payment | Principal | Interest | Ending Balance | Cumulative Interest |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 06/03/2003 | $ 24,143.69 | $ 319.00 | $ 1.00 | $ 320.00 | $ 64.08 | $ 255.92 | $ 24,079.61 | $ 255.92 |
| 2 | 07/07/2003 | 24,079.61 | 319.00 | 1.00 | 320.00 | 64.76 | 255.24 | 24,014.86 | 511.17 |
| 3 | 08/03/2003 | 24,014.86 | 319.00 | 1.00 | 320.00 | 65.44 | 254.56 | 23,949.41 | 765.72 |
| 4 | 09/05/2003 | 23,949.41 | 319.00 | 1.00 | 320.00 | 66.14 | 253.86 | 23,883.28 | 1,019.59 |
| 5 | 10/08/2003 | 23,883.28 | 319.00 | 1.00 | 320.00 | 66.84 | 253.16 | 23,816.44 | 1,272.75 |
| 6 | 11/10/2003 | 23,816.44 | 319.00 | 1.00 | 320.00 | 67.55 | 252.45 | 23,748.90 | 1,525.21 |
| 7 | 12/10/2003 | 23,748.90 | 319.00 | 1.00 | 320.00 | 68.26 | 251.74 | 23,680.63 | 1,776.94 |
| 8 | 01/07/2004 | 23,680.63 | 319.00 | 1.00 | 320.00 | 68.99 | 251.01 | 23,611.65 | 2,027.96 |
| 9 | 02/10/2004 | 23,611.65 | 319.00 | 1.00 | 320.00 | 69.72 | 250.28 | 23,541.93 | 2,278.24 |
| 10 | 03/09/2004 | 23,541.93 | 319.00 | 1.00 | 320.00 | 70.46 | 249.54 | 23,471.48 | 2,527.79 |
| 11 | 04/15/2004 | *23,496.48 | 319.00 | 1.00 | 320.00 | 70.94 | 249.06 | 23,425.54 | 2,776.85 |
| 12 | 05/11/2004 | *23,450.24 | 319.00 | 1.00 | 320.00 | 71.43 | 248.57 | 23,378.81 | 3,025.42 |
| 13 | 06/09/2004 | 23,378.81 | 319.00 | 1.00 | 320.00 | 72.18 | 247.82 | 23,306.63 | 3,273.24 |
| 14 | 07/16/2004 | *23,331.63 | 319.00 | 1.00 | 320.00 | 72.68 | 247.32 | 23,258.95 | 3,520.55 |
| 15 | 08/16/2004 | *23,283.95 | 319.00 | 1.00 | 320.00 | 73.19 | 246.81 | 23,210.76 | 3,767.36 |
| 16 | 09/12/2004 | *23,235.76 | 319.00 | 1.00 | 320.00 | 73.70 | 246.30 | 23,162.06 | 4,013.66 |
| 17 | 10/15/2004 | *23,187.06 | 319.00 | 1.00 | 320.00 | 74.22 | 245.78 | 23,112.84 | 4,259.44 |
| 18 | 11/03/2004 | *23,137.84 | 319.00 | 1.00 | 320.00 | 74.74 | 245.26 | 23,063.10 | 4,504.71 |
| 19 | 12/23/2004 | *23,088.10 | 319.00 | 1.00 | 320.00 | 75.27 | 244.73 | 23,012.83 | 4,749.44 |
| 20 | 01/27/2005 | *23,037.83 | 319.00 | 1.00 | 320.00 | 75.80 | 244.20 | 22,962.03 | 4,993.64 |
| 21 | 02/23/2005 | *22,987.03 | 319.00 | 1.00 | 320.00 | 76.34 | 243.66 | 22,910.69 | 5,237.30 |
| 22 | 04/18/2005 | *22,935.69 | 319.00 | 1.00 | 320.00 | 76.88 | 243.12 | 22,858.81 | 5,480.42 |
| 23 | 05/13/2005 | *22,383.81 | 319.00 | 1.00 | 320.00 | 82.73 | 237.27 | 22,301.08 | 5,717.69 |
| 24 | 06/03/2005 | *22,326.08 | 0.00 | - | 0.00 | (236.66) | 236.66 | 22,562.74 | 5,954.35 |
| 25 | 07/03/2005 | *22,587.74 | 0.00 | - | 0.00 | (239.43) | 239.43 | 22,827.17 | 6,193.78 |
| 26 | 08/03/2005 | *22,852.17 | 0.00 | - | 0.00 | (242.23) | 242.23 | 23,094.40 | 6,436.01 |
| 27 | 09/03/2005 | *23,119.40 | 0.00 | - | 0.00 | (245.07) | 245.07 | 23,364.47 | 6,681.07 |
| 28 | 10/03/2005 | *23,389.47 | 0.00 | - | 0.00 | (247.93) | 247.93 | 23,637.40 | 6,929.00 |
| 29 | 11/03/2005 | *23,662.40 | 0.00 | - | 0.00 | (250.82) | 250.82 | 23,913.22 | 7,179.82 |
| 30 | 12/03/2005 | *23,938.22 | 0.00 | - | 0.00 | (253.75) | 253.75 | 24,191.97 | 7,433.57 |
| 31 | 01/03/2006 | *24,216.97 | 0.00 | - | 0.00 | (256.70) | 256.70 | 24,473.67 | 7,690.27 |

† Payment dates were obtained from Plaintiff's Exhibits 5-7.

* Indicates $25 late fee added to "Beginning Balance." Such a fee was provided for in the Note. Plaintiff's Exhibit 4 no. 471.

Plaintiff's accounting of late payments, including copies of Debtor's payments to Plaintiff, are set forth in Plaintiff's Exhibits 5-7.

13